IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:18CR401-3 |
| | ) | |
| | ) | |
| DAVID WORTH STEELE | ) | |

**MEMORANDUM ORDER**

This matter is before the Court on Defendant David Worth Steele's Motion for Appointment of Counsel and for Compassionate Release [Doc. #162]. (See also Gov't's Resp. to Def.'s Mot. [Doc. #164]; Reply to the Gov't's Resp. [Doc. #171]; Suppl. to Movant's Resp. to Gov't's Reply [Doc. #175].) Steele contends that his health conditions, by themselves and combined with the likelihood of contracting COVID-19 at FCI Loretto, constitute extraordinary and compelling reasons warranting release. Most recently, Steele claims to be among the hundreds of inmates at FCI Loretto who were reported as testing positive for COVID-19, and he is concerned about his resulting health prospects. For the reasons explained below, his motion is denied.

As an initial matter, the Sixth Amendment right to counsel does not extend beyond the first appeal of right. Pennsylvania v. Finley, 481 U.S. 551, 555 (1987). In exceptional circumstances, due process may require appointment of counsel in certain postconviction proceedings, but Steele's instant motion is not among those. See United States v. Legree, 205 F.3d 724, 730 (4th Cir. 2000)

(denying appointment of counsel for § 3582(c) motion to reduce sentence). Cf. 18 U.S.C. § 3006A(a)(2)(B) (authorizing the court to provide counsel to a financially eligible person seeking relief under 28 U.S.C. §§ 2241, 2254, or 2255 when "the interests of justice so require").  Accordingly, his request for appointment of counsel is denied.

On August 23, 2019, Steele was sentenced to 240 months' imprisonment. "The court may not modify a term of imprisonment once it has been imposed except", as is relevant here, "upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier". 18 U.S.C. § 3582(c)(1)(A).  Steele submitted a request for compassionate release to his warden dated April 8, 2020 that was denied April 16. Thirty days had passed since the warden's receipt of his request when he filed the instant motion.  Therefore, he has exhausted his administrative remedies.

He must next meet his burden of showing that extraordinary and compelling reasons warrant relief, see 18 U.S.C. § 3582(c)(1)(A)(i), and this he has not done. See United States v. McCoy, 981 F.3d 271, 284 (4th Cir. 2020) (finding "no 'applicable' policy statement governing compassionate-release motions filed by defendants under the recently amended § 3582(c)(1)(A)," "empower[ing]" courts "to consider any extraordinary and compelling reason for release that a defendant might raise") (citation omitted); U.S. Sentencing Guideline § 1B1.13, Application

2

n.1 (providing circumstances found to be extraordinary and compelling) cited in McCoy, 981 F.3d at 282 n.7 (noting that § 1B1.13 "remains helpful guidance even when motions are filed by defendants"); Dep't of Justice, Fed. Bureau of Prisons, Program Statement 5050.50 (Jan. 17, 2019) (explaining circumstances supporting compassionate release).

Steele relies on his medical conditions, alone and in combination with COVID-19, as extraordinary and compelling reasons for relief. Under certain circumstances, an inmate's medical conditions may constitute extraordinary and compelling reasons warranting release. See, e.g., U.S. Sentencing Guidelines § 1B1.13, Application n.1(A). Steele's medical conditions are serious and, as of October 2020, include heart failure, chronic obstructive pulmonary disease ("COPD"), the presence of coronary angioplasty implant and graft, old myocardial infarction, hypertension, and obesity. He is prescribed medications to treat these conditions.

However, the warden explained in his April 2020 denial of Steele's request for compassionate release that the medical review/summary determined, among other things, that Steele was not completely disabled, was able to perform activities of daily living, and was not confined to a bed or chair more than 50% of waking hours. In addition, Steele does not argue that the Bureau of Prisons is not able to provide or is not providing his necessary medical care. As evidenced by his medical records, since incarceration, Steele has been receiving medical attention for his conditions. For example, he has been treated in the Cardiac Chronic Care

3

Clinic, was transported to the local hospital for admission where he underwent cardiac catheterization, and received a follow-up echocardiogram at FCI Loretto where he was recommended for a cardiology evaluation for a defibrillator. It was noted in September 2020, though, that the pandemic had impacted the accessibility of a repeat echocardiogram and that "if [Steele's] cardiac function has not improved and implantable defibrillator is necessary, will proceed with getting that accomplished and then will submit 770 Redesignation request". There appears to be no further related information. In sum, the record before the Court shows that, while Steele's medical conditions are serious, he is being assessed and treated for them while in the custody of the Bureau of Prisons and he does not argue otherwise. Therefore, they do not alone warrant release.

In addition to relying on his medical conditions as a basis for compassionate release, Steele also argues that they place him at higher risk of death were he to contract COVID-19. Indeed, the Centers for Disease Control and Prevention ("CDC") recognize that COPD, heart conditions (such as heart failure, coronary artery disease, or cardiomyopathies), and obesity are each conditions that increase the risk of severe illness from the virus that causes COVID-19. https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (updated Dec. 29, 2020). Hypertension may also do so. Id.

Steele describes that at FCI Loretto he is surrounded by 130 inmates at all times in his housing unit where he shares "a cube" with six others without social

4

distancing. They share the community bathroom and telephones where common surfaces and common areas are not properly sanitized. Some inmates do not wear masks. Steele is in direct contact with multiple staff who take shifts and touch common surfaces shared with inmates, possibly spreading the virus all while showing no symptoms.

When the Government responded to Steele's motion on November 2, 2020, FCI Loretto reported no inmates presently positive for COVID-19 and fifty-five inmates who had recovered, leading the Government to state that "at present, FCI Loretto appears to have successfully controlled the spread of the virus". At the same time, the assessment of whether Steele's increased risk of severe illness from COVID-19 constituted an extraordinary and compelling reason was hypothetical.

However, in the following month, the number of inmates at FCI Loretto reported as testing positive for COVID-19 rose drastically. When the Court reviewed the Bureau of Prisons coronavirus reporting on December 11, 2020, FCI Loretto reported that 609 of its 860 inmates were presently infected. In Steele's January 4, 2021 supplemental filing, he describes conditions at the facility that led to the "predictable outcome" of "the rapid escalation of COVID cases" and claims to be among those inmates who contracted COVID-19 in the intervening time period. He says that he has "suffered a host of symptoms approaching a need for hospitalization" and is "still dealing with lingering symptoms ('long-hauler syndrome') and fears what other health related issues might arise in the future."

5

Steele is concerned about his "continuing health risks" if he were "to relapse" during recovery and require hospitalization before possibly dying, his "potential health risks down the line", and becoming infected again only to suffer "much more pronounced" symptoms with "greatly enhanced" "likelihood of detrimental outcomes".

Steele does not provide sufficient information about or evidence of his present health resulting from COVID-19 to find that it constitutes an extraordinary and compelling reason for release. His worry about his future health is understandable, but this worry and the fear of contracting the virus again are insufficient to warrant release. And, as for his concern over reinfection, scientific studies should allay those fears.

On October 20, 2020, the Director of the National Institutes of Health ("NIH") described the results of two studies published in the journal Science Immunology whose "findings show that people who survive COVID-19 infection continue to produce protective antibodies against key parts of the virus for at least three to four months after developing their first symptoms" although "some other antibody types decline more quickly." Dr. Francis Collins, NIH Director's Blog, Two Studies Show COVID-19 Antibodies Persist for Months (Oct. 20, 2020), https://directorsblog.nih.gov/2020/10/20/two-studies-show-covid-19-antibodies-persist-for-months/. "While longer-term study is needed, the findings lend support to evidence that protective antibody responses against the novel virus do persist." Id.

6

Today, January 14, 2021, Public Health England ("PHE") issued a press release summarizing results of its SARS-CoV-2 Immunity and Reinfection EvaluatioN ("SIREN") study (apparently not yet peer reviewed) – "naturally acquired immunity as a result of past infections provide 83% protection against reinfection, compared to people who have not had the disease before" and "[t]his appears to last at least 5 months from first becoming sick." Public Health England, <u>Past COVID-19 Infection Provides Some Immunity but People May Still Carry and Transmit Virus</u>, https://www.gov.uk/government/news/past-covid-19-infection-provides-some-immunity-but-people-may-still-carry-and-transmit-virus (Jan. 14, 2021) (describing having regularly tested 20,787 healthcare workers since June 2020). And, the patients whose reinfections were "probable" "reported that their symptoms were less severe the second time." <u>Id.</u> These studies suggest that Steele may have some immunity to the virus for at least five months after he first became ill and, were he to become reinfected, his symptoms may be less severe.

Even if this were not the case, there is "[c]ritical [c]ommunity [s]pread" of the virus in Surry County, North Carolina, where Steele plans to return upon release, (<u>see</u> Presentence Report ¶ 105). <u>See</u> N.C. Dep't of Health & Human Servs., COVID-19 County Alert System, https://files.nc.gov/covid/documents/dashboard/COVID-19-County-Alert-System-Report.pdf (reporting Surry County's 14-day Case Rate Per 100,000 as 1101.9, its 14-day Percent Positive as 17.1%) (updated Jan. 6, 2021). Based on the record,

7

it cannot be determined that Steele would be more protected from contracting COVID-19 again were he to be released.

Even if Steele had met his burden of showing extraordinary and compelling reasons warranting relief, the requisite application of the factors from 18 U.S.C. § 3553(a), see 18 U.S.C. § 3582(c)(1)(A), counsel against his release.  On the one hand, Steele's only prior criminal conviction is for fictitious or altered title or registration card in 2013.  He appears to have maintained lawful employment from 1990 until 2015.  He claims to have "complied with all the rules and regulations of his incarceration as evidenced by the fact that he has not received any incident reports for un-sanctioned behavior."  According to Steele, he also "meets the 'minimum' recidivism score" such that the Bureau of Prisons recommended him for home confinement in April 2020.

On the other hand, the Government contends that it was informed that "Steele is ineligible for home confinement under the BOP's expanded authority or the CARES Act, as he has a current violent offense and had, at [the time of the Government's inquiry], only served 14.1% of his statutory sentence."

According to Steele, he chose to participate in this drug conspiracy after losing his business in 2015 to his ex-wife.  And, once he was a part of the conspiracy, he was undeterred, even by intervening arrests.  For example, in April 2016, Steele was arrested after 984.6 grams of methamphetamine were seized during the execution of a search warrant at his residence.  He was released on bond several days later.  In April 2017, he was again arrested after having been

found in possession of methamphetamine, oxycodone, drug paraphernalia, and a rifle. He was released on bond several days later. In December of that year, nearly $10,000, methamphetamine, and six firearms were found in Steele's residence during the execution of a search warrant. He was arrested and released on bond. In June 2018, another search of his residence revealed, among other items, over $5,000, methamphetamine, ammunition, and seventeen firearms (with an additional firearm in a vehicle). Steele was arrested and admitted that after previous arrests he would quickly return to the distribution of methamphetamine. Ultimately, Steele was held accountable for 317.5 kilograms of methamphetamine and 300 grams of fentanyl after pleading guilty to conspiring to distribute methamphetamine and possessing a firearm in furtherance of a drug trafficking crime. In sum, Steele's participation in the multi-year conspiracy while also possessing numerous firearms even after having been arrested evidences the continuing threat he posed to public safety and the necessary deterrent of incarceration.

For the reasons explained above, IT IS HEREBY ORDERED that Defendant David Worth Steele's Motion for Appointment of Counsel and for Compassionate Release [Doc. #162] is DENIED.

This the 14th day of January, 2021.

/s/ N. Carlton Tilley, Jr.
Senior United States District Judge